UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

MARILYN CLEVELAND, *as Personal Representative*   )
*of the Estate of Donald Cleveland, deceased*,      )
                                                   )
                         *Plaintiff*,               )
                                                   )
             v.                                     )      No. 4:20-cv-00167-JMS-DML
                                                   )
UNITED STATES OF AMERICA,                           )
                                                   )
                         *Defendant*.               )


**ORDER**

Donald Cleveland was injured while a patient at the Richard L. Roudebush VA Medical Center in Indianapolis, Indiana ("the VA Hospital"), and ultimately passed away.  His wife, Marilyn Cleveland, initiated this litigation against Defendant the United States of America on August 3, 2020, [Filing No. 1], and the United States has now filed a Motion to Preclude Expert Testimony related to two experts Ms. Cleveland seeks to rely upon in the trial of this matter. [Filing No. 51.]  That motion is now ripe for the Court's decision.

**I.**
**BACKGROUND**

The following factual background is taken from the allegations set forth in the Complaint, which the Court accepts as true at this time for purposes of analyzing the Motion to Preclude Expert Testimony.

Mr. Cleveland was admitted to the VA Hospital on February 28, 2017 with a fever, suspected sepsis, bilateral lower extremity cellulitis with osteomyelitis of the right first MP joint,[1] an elevated white blood cell count, and an elevated lactate level.  [Filing No. 1 at 3.]  Mr. Cleveland had a history of falling and it was noted that he often overestimated and forgot his limitations. [Filing No. 1 at 3.]

After his admission, Mr. Cleveland stated that he needed to use the restroom and asked to sit on the bedside commode.  [Filing No. 1 at 3.]  A nurse and technician assisted Mr. Cleveland to the commode without incident, and left the room to give Mr. Cleveland some privacy.  [Filing No. 1 at 3.]  When the technician went back into Mr. Cleveland's room, she saw that Mr. Cleveland had become unresponsive and had leaned backwards on the bedside commode.  [Filing No. 1 at 3.]  The technician called for nurse assistance and the responding nurse called a Code Blue.  [Filing No. 1 at 3.]

Mr. Cleveland was immediately intubated.  [Filing No. 1 at 3.]  A CT scan showed that Mr. Cleveland had an L1/L2 fracture in his spine.  [Filing No. 1 at 3.]  He improved clinically and was extubated on March 2, 2017, however, when he was extubated, Mr. Cleveland reported that he was unable to move his bilateral lower extremities.  [Filing No. 1 at 3.]

On March 3, 2017, the VA Hospital transferred Mr. Cleveland to Indiana University Health Methodist Hospital, a Level 1 trauma center, for a neurosurgery evaluation.  [Filing No. 1 at 3.]  Mr. Cleveland's condition continued to deteriorate and he passed away on March 6, 2017.  [Filing No. 1 at 3.]

---

[1] Osteomyelitis is a "painful bone infection [that] causes swelling that can damage bone and lead to bone loss," and is caused by bacteria or fungi.  http://www.my.clevelandclinic.org/health/diseas-es/9495-osteomyelitis (last accessed Aug. 23, 2022).  MP joints are the "large joints in the hand at the base of each finger."  https://www.massgeneral.org/orthopaedics/hand/conditions-and-treatments/arthritis-mp-joint (last accessed Aug. 23, 2022).

Ms. Cleveland, as the personal representative of Mr. Cleveland's estate, initiated this action on August 3, 2020, after filing the proper notices with the United States under the Federal Tort Claims Act.  [Filing No. 1.]  She asserts a negligence claim against the United States relating to the care Mr. Cleveland received at the VA Hospital and the spinal cord injury that he suffered.  [Filing No. 1 at 4.]  The United States has filed a Motion to Preclude Expert Testimony, seeking to prohibit two of Ms. Cleveland's medical experts from opining on various matters.  [Filing No. 51.]

## II.
### STANDARD OF REVIEW

When relying on expert testimony, a party must disclose certain information about the expert and provide the expert's written report, which "must contain…a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  "If a party fails to provide [this] information…the party is not allowed to use that information or witness to supply evidence…at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Additionally, the Court has a "gatekeeping obligation" under Federal Rule of Evidence 702, and "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony."  *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).  The Seventh Circuit Court of Appeals "give[s] the district court wide

latitude in performing its gate-keeping function and determining how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

### III.
### DISCUSSION

Ms. Cleveland has identified two experts upon whose testimony she wishes to rely at trial – Dr. Jeffrey Oppenheimer and Mary Fischer, R.N.  The United States seeks to preclude various aspects of Dr. Oppenheimer's and Nurse Fischer's testimony, [*see* Filing No. 52], and the Court discusses each expert's testimony in turn.

### A.    Dr. Oppenheimer

Dr. Oppenheimer is a licensed physician and is board-certified in neurological surgery. [Filing No. 51-1 at 2.]  He currently practices and continues to perform spinal surgeries and consultations on "traumatic brain injuries, strokes, and various intracranial pathology."  [Filing No. 51-1 at 2.]  Over his 31-year career, Dr. Oppenheimer has performed over 2,000 surgeries, with 35% of those surgeries being cranial and 65% being spinal.  [Filing No. 51-1 at 2.]

Dr. Oppenheimer notes in his expert report that after his fall, Mr. Cleveland was diagnosed with "a traumatic spinal cord injury, sepsis secondary to cellulitis, atrial fibrillation with rapid ventricular response, coronary artery disease, a history of ventricular tachycardia s/p implanted cardioverter defibrillator, type II diabetes mellitus, morbid obesity, and chronic venous stasis." [Filing No. 51-1 at 3.]  Dr. Oppenheimer set forth his conclusions regarding Mr. Cleveland as follows:

> Due to his poor medical condition and body habitus, an adequate MRI of the spine could not be performed and the spinal canal and cord itself were inadequately evaluated by CT scanning.  However, the findings on that were documented on the study [and] were consistent [with] a force significant enough to cause the fracture of the L1 vertebra, distraction of the L12 vertebra and disc space.  There was also

a suggestion of hematoma within disc space itself and concomitant retroperitoneal blood clearly would be consistent with a spinal cord injury.  This could be from either contusion, hematoma and/or flexion distraction of the cord or a combination of this lesions.  Suffice it to say, that despite the inability to directly assess the spinal [cord] via neuroimaging, the concomitant vertebral fracture, hematoma, and the distraction of L12 disc space, would make the diagnosis of traumatic spinal cord injury inevitable.  In addition, consistent with these imaging findings, paraplegia was documented by the NPs.

In conclusion, I state with no uncertainty, that the cause of the patient's spinal cord injury was the blunt trauma he suffered to his back when he fell on 02.28.17.  This began a cascade of events and symptoms, along with his comorbidities and poor medical condition, that lead to his death.

[Filing No. 51-1 at 3-5.][2]

The United States seeks to exclude Dr. Oppenheimer's opinions regarding Mr. Cleveland's cause of death, any imaging of Mr. Cleveland's spinal injuries, and the cause of Mr. Cleveland's hyperextension incident on the bedside commode.  [*See* Filing No. 52 at 1.]  The Court addresses each opinion in turn.

### 1.    *Testimony Regarding Cause of Death*

As to Dr. Oppenheimer's opinion regarding Mr. Cleveland's cause of death, the United States argues that Dr. Oppenheimer testified in his deposition that "the cause of…death fell outside the scope of his engagement and report." [Filing No. 52 at 21.]  The United States asserts that Dr. Oppenheimer also testified that he agreed with the United States' causation expert, Dr. Zelby, that Mr. Cleveland's death was not caused by his spinal injury, but rather by "unrelated medical and pulmonary causes." [Filing No. 52 at 21.]  It also points to Dr. Oppenheimer's deposition testimony in which he clarified that he did not believe that Mr. Cleveland would have lived absent the spinal injuries.  [Filing No. 52 at 22.]  The United States notes Dr. Oppenheimer's testimony that Mr.

---

[2] Dr. Oppenheimer's expert report contains two versions of one paragraph, [*see* Filing No. 51-1 at 3-5], and the Court assumes that the later version – which appears to add a missing line of text – is the version upon which Ms. Cleveland seeks to rely.

Cleveland's family withdrew life-preserving care; that Mr. Cleveland could have continued living if that life-preserving care had not been withdrawn; and that although Mr. Cleveland would have had a limited life expectancy even with life-preserving care, his death "under those circumstances would have been a result not of his spinal injuries but of other comorbidities and poor health." [Filing No. 52 at 22 (quotation and citation omitted).]

In her response, Ms. Cleveland argues that Dr. Oppenheimer testified that "the [spinal cord] injury caused a cascade of events and symptoms along with Mr. Cleveland's comorbidities and that Mr. Cleveland would not have survived long as a paraplegic." [Filing No. 58 at 27.] She argues that it was "Mr. Cleveland's comorbidities and poor medical condition, that led to [his] death," but that "Dr. Oppenheimer did state [that] Mr. Cleveland died of other causes but also testified Mr. Cleveland would not have survived long as a paraplegic." [Filing No. 58 at 35.]

In its reply, the United States reiterates its arguments and contends that Ms. Cleveland does not set forth any developed counter-arguments. [Filing No. 59 at 4-5.]

The Court agrees with the United States that, according to his deposition testimony, Dr. Oppenheimer was not retained to provide an opinion regarding Mr. Cleveland's cause of death. Specifically, Dr. Oppenheimer testified as follows:

Q:  And you haven't been retained as an expert with respect to the question addressed in that statement; correct?

A:  No, I'm not – my charge was not to describe the actual cause of death.

[Filing No. 51-3 at 34-35.]  Additionally, Ms. Cleveland does not argue in her response that Dr. Oppenheimer was retained to provide an opinion regarding cause of death.  [*See* Filing No. 58.]

Moreover, Dr. Oppenheimer does not provide any opinions in his report regarding Mr. Cleveland's cause of death, as required by Fed. R. Civ. P. 26(a)(2)(B)(i).  The closest he comes is stating that the spinal cord injury "began a cascade of events and symptoms, along with his

comorbidities and poor medical condition, that lead to his death." [Filing No. 51-1 at 5.]  This is distinct from opining regarding the exact cause of death.  Because Dr. Oppenheimer did not opine regarding Mr. Cleveland's cause of death in his report, and since Ms. Cleveland has not shown that this omission was substantially justified or is harmless, Dr. Oppenheimer's opinion regarding Mr. Cleveland's cause of death is excluded.

Additionally, even if Dr. Oppenheimer had opined in his report that the spinal cord injury caused Mr. Cleveland's death, he then testified at his deposition that he explicitly agrees that the spinal cord injury was not the cause of death.  He testified as follows:

Q:  You state, quote, this began a cascade of events and symptoms along with [Mr. Cleveland's] comorbidities and poor medical condition that led to his death, end quote.  Do you see that?

A:  Yes.

Q:  And what's the cascade of events and symptoms that you're referring to in this sentence?

A:  His – you know, his overall medical stability in terms of his obesity, his syncope, his heart.  You know, he was a sick man.  And then being immobile and paralyzed added to that.

Q:  Okay.  So those items that you identified, the obesity, syncope, heart condition, and immobility or paralysis is the complete cascade of events and symptoms that you're referring to in that sentence?

A:  I would have to review the details of the record.  I know he had a lot of medical issues.  I don't recall them offhand.  If you want me to go through the chart, I will.  He was a sick guy.  He's in really poor medical condition, and somebody who is in poor medical condition who also becomes paraplegic is really at a high risk for death.

Q:  Okay.  So you've identified all the comorbidities, just sitting here today, that you can recall that you were referring to in that sentence?

A:  Yeah.  I mean, I can – there may be more.  Like I said, if you want me to go page by page through the record, I can do that.  But the main ones were his obesity, syncope, his overall cardiovascular status, the fact that he went unconscious.  All those things contributed.

Q:  And that's also what you were referring to when you referred to his poor medical condition?

A:  Yes.

Q:  Okay.  In your opinion, did Mr. Cleveland's spinal injuries cause his chronic respiratory failure?

A:  No.

Q:  In your opinion, did Mr. Cleveland's spinal injuries cause his acute respiratory failure?

A:  No.

Q:  And the underlying cause of Mr. Cleveland's chronic respiratory failure was chronic obstructive pulmonary disease; correct?

A:  Yes.

***

Q:  In view of what we've discussed, in terms of the cause for the acute and chronic respiratory failure which were identified as the cause of death in the first entry on his death certificate, Mr. Cleveland's spinal injuries that are at issue in this case were not a but for cause of his death; correct?

A:  But for?  What does that mean?

Q:  As in without those injuries, he would not have died.

A:  That's correct.

[Filing No. 51-3 at 23-25.]

Dr. Oppenheimer testified further:

Q:  And a few sentences further down, [the United States' expert] Dr. Zelby states that, quote, Mr. Cleveland died from respiratory causes after the family chose to withdraw care.  Because the level of the spinal cord injury is below the level of innervation for all the respiratory muscles, including the diaphragm and the intercostal muscles, the spinal cord injury did not cause Mr. Cleveland's death, end quote.  And I believe we discussed –

A:  I would agree with that statement.

8

***

Q:  And Dr. Zelby next states that, quote, the medical records do not support a concept that the lower thoracic upper lumbar spinal cord injury caused Mr. Cleveland's death.  Mr. Cleveland died from unrelated medical and pulmonary issues, end quote.  And I believe we discussed that earlier.

A:  Yes.  We're in agreement on that.

[Filing No. 51-3 at 33.]  Dr. Oppenheimer's deposition testimony makes any opinion that Mr. Cleveland's spinal cord injury caused his death unreliable and of no aid to the factfinder.

Because Dr. Oppenheimer was not retained to provide an opinion regarding Mr. Cleveland's cause of death, did not provide an opinion on the cause of death in his report and, in any event, testified at his deposition that the spinal cord injury was not Mr. Cleveland's cause of death, he is precluded from testifying at trial regarding Mr. Cleveland's cause of death.  Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1); Fed. R. Evid. 702.

### 2.    *Testimony Regarding Imaging of Spinal Cord Injury*

The United States also argues that the Court should preclude Dr. Oppenheimer from testifying regarding the imaging of Mr. Cleveland's spinal cord injury because his report does not contain any discussion of the imaging and he testified at his deposition that he had not reviewed the imaging and had no opinions regarding the imaging.  [Filing No. 52 at 23.]

In response, Ms. Cleveland argues that Dr. Oppenheimer testified in his deposition that he reviewed a report of the imaging and that "the report was completed by an expert trained to look at the images."  [Filing No. 58 at 35.]  She also asserts that since Mr. Cleveland was a paraplegic after the incident, an image "was not needed because paraplegic is a clinical diagnosis."  [Filing No. 58 at 35.]  She contends that Dr. Oppenheimer should be able to testify regarding the imaging because he relied on the report of the imaging.  [Filing No. 58 at 35.]

The United States argues in its reply that Ms. Cleveland does not identify the report of the imaging that she contends Dr. Oppenheimer relied upon, and that Dr. Oppenheimer "expressly and repeatedly testified that he had no opinions arising from or relating to imaging of Mr. Cleveland's injuries, and he should therefore be barred from providing any such opinions for the first time at trial." [Filing No. 59 at 5-6.]

Dr. Oppenheimer did not state in his report that he reviewed the imaging of Mr. Cleveland's spine, and Ms. Cleveland does not argue otherwise. Rather, he simply re-capped what the report of the imaging stated. Because any testimony regarding the imaging of Mr. Cleveland's spine would go beyond what Dr. Oppenheimer discussed in his report, and since Ms. Cleveland has not shown that the omission of this opinion from Dr. Oppenheimer's report was substantially justified or is harmless, it is precluded. Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1).

Further, Dr. Oppenheimer testified that he did not, in fact, review the imaging of Mr. Cleveland's spine:

> Q: Okay. Did you review any imaging relating to Mr. Cleveland in preparing the opinions set forth in this report?
>
> A: No.
>
> ***
>
> Q: Given that you did not review any of the [VA Hospital's] records related to Mr. Cleveland's care at that hospital, you don't have any opinions arising from or relating to those records; correct?
>
> A: Yes, that's correct.
>
> Q: And given that you didn't review the imaging produced by the United States…, you don't have any opinions arising from or relating to those records; correct?
>
> A: Correct.

Q:  And given that you did not review any other imaging of Mr. Cleveland, you do not have any opinions arising from or relating to such imaging to the extent it exists; correct?

A:  Yes.

[Filing No. 51-3 at 6-9.]   Because Dr. Oppenheimer did not review the imaging, but simply regurgitated what the reviewing radiologist stated in the report of the imaging, any testimony regarding that imaging would be unreliable and would not aid the factfinder.  *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."); *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at *6 (N.D. Ill. 2014) ("Expert testimony does not assist the trier of fact when the [factfinder] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony.") (quotation and citation omitted).  Because Dr. Oppenheimer's expert report does not set forth an opinion regarding the imaging of Mr. Cleveland's spine and since Dr. Oppenheimer testified that he has not reviewed the imaging, Dr. Oppenheimer is precluded from testifying regarding the imaging of Mr. Cleveland's spine at trial.

### 3.   *Testimony Regarding Cause of Hyperextension Injury*

The United States argues that Dr. Oppenheimer should be precluded from testifying regarding the cause of Mr. Cleveland's hyperextension injury because he did not set forth this opinion in his report and admitted that fact in his deposition.  [Filing No. 52 at 23.]

Ms. Cleveland does not respond directly to the United States' argument, stating only that none of the experts "are able to determine the cause of the syncope event that lead to the hyperextension event on the bedside commode due to lack of documentation in the medical records," that the event was not witnessed by VA Hospital staff, and that "[t]he injury could have

been avoided if Mr. Cleveland had not been left alone because he was a fall risk." [Filing No. 58 at 35.]

In its reply, the United States reiterates its argument.  [Filing No. 59 at 6.]

As with Mr. Cleveland's cause of death and the spinal imaging, Dr. Oppenheimer does not discuss in his report the cause of Mr. Cleveland's hyperextension injury.  [*See* Filing No. 51-1 at 3.]  Instead, he merely states that "[o]n or around February 28, 2017, [Mr. Cleveland] fell at the VA [H]ospital." [Filing No. 51-1 at 3.]  Additionally, Dr. Oppenheimer admitted in his deposition that he did not opine regarding the cause of Mr. Cleveland's hyperextension injury in his report, testifying:

> Q:  Your report does not state an opinion regarding what caused Mr. Cleveland to fall unconscious and become hyperextended on the bedside commode; correct?
>
> A:  No, it does not.

[Filing No. 51-3 at 16.]

Because Dr. Oppenheimer did not opine in his report regarding the cause of Mr. Cleveland's hyperextension injury, and since Ms. Cleveland has not shown that this omission was substantially justified or harmless, Dr. Oppenheimer may not testify on that topic.  Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1).

In sum, Dr. Oppenheimer did not include in his report any opinions regarding Mr. Cleveland's cause of death, the spinal imaging, or the cause of Mr. Cleveland's hyperextension injury, so he may not testify at trial regarding those opinions.[3]  Fed. R. Civ. P. 26(a)(2)(B)(i); Fed.

---

[3] Ms. Cleveland argues in a cursory fashion that Dr. Oppenheimer should be permitted to testify regarding topics not discussed in his report because those topics were covered in his deposition. [Filing No. 58 at 36.]  But "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.  The purpose of Rule 26(a)(2) is to provide notice to opposing counsel – before the deposition – as to what the expert witness will testify…and this purpose would be completely undermined if the parties were allowed to cure deficient reports

R. Civ. P. 37(c)(1).  Further, his testimony regarding Mr. Cleveland's cause of death and the spinal imaging would be unreliable and of no aid to the factfinder in any event.  The United States' Motion to Preclude Expert Testimony is **GRANTED** as it relates to Dr. Oppenheimer.

### B.    Nurse Fischer

Nurse Fischer has been a Registered Nurse for forty years, and has spent twenty-two of those years as a Certified Nurse Surveyor for the Center for Medicare and Medicaid Services ("CMS").   [Filing No. 51-2 at 2.]   In that position, Nurse Fischer "investigated and made determinations of compliance for CMS[,] the offices of Medicare and State Medicaid[,] and State Licensure programs."   [Filing No. 51-2 at 2.]   She believes she is "competent to offer expert opinions regarding the American Nurses Association – Standards of Practice and Ethics applicable to the [VA Hospital], and breaches thereof, regarding [Mr.] Cleveland."   [Filing No. 51-2 at 2.]

In her report, Nurse Fischer sets forth the chain of events leading up to Mr. Cleveland's death and opines as follows:

> It is my opinion the nursing staff at the [VA Hospital] failed to follow the Standards of Nursing Practice, Care and Ethics which resulted in substandard quality of care as to the proper assessment of Mr. Cleveland's ability to balance himself safely while seated on the bariatric commode, failure to ensure fall precautions were in place, and failure to employ strategies to promote his health and safety after being found unconscious.
>
> In addition the nursing staff at the [VA Hospital] failed to follow the guidelines established from the American Heart Association by immediately activating the alarm for the Emergency Response Team when Mr. Cleveland was found unresponsive and failed to provide for a safe transfer from the bariatric commode to the floor by not waiting for additional help.  Instead the Charge Nurse pulled the commode out from underneath Mr. Cleveland causing a traumatic fall to the floor. Mr. Cleveland's fall resulted in a distracted fracture of his spinal cord in addition to a retroperitoneal hematoma while in their care.

---

with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). The fact that topics not included in Dr. Oppenheimer's report were covered in his deposition does not make his opinions on those topics admissible.

[Filing No. 51-2 at 5.]

The United States seeks to exclude Nurse Fischer's opinion that VA Hospital staff failed to timely activate the emergency response system after finding Mr. Cleveland in distress, her opinion that VA Hospital staff failed to transfer Mr. Cleveland to the floor in an appropriate manner, and any other opinions that she did not provide in her report. [Filing No. 52 at 23-27.] The Court addresses each topic below.

### 1.   Testimony Regarding Failure to Activate the Emergency Response System

The United States argues that Nurse Fischer should be precluded from testifying regarding VA Hospital staff's failure to activate the emergency response system because that opinion is "allegedly based on a guideline promulgated by the American Heart Association that she did not provide to [the United States] and that she could not remember except in the vaguest of terms." [Filing No. 52 at 24.] It notes that Nurse Fischer testified that she did not know which version of the guideline was in effect at the relevant time, and that she did not know "whether that guidance provides that a medical professional encountering an unconscious patient must always activate the emergency response system first before doing anything else, or whether it identifies specific circumstances in which such a requirement applies." [Filing No. 52 at 24.] The United States asserts that even if Nurse Fischer relied on a specific guideline that was in effect at the time of Mr. Cleveland's fall, "her assessment of the effect of this alleged negligence is based not on 'sufficient and known facts,' but on pure conjecture." [Filing No. 52 at 24.] It notes that Nurse Fischer testified that she does not know when the emergency response system was activated, does not have any estimate of the delay between the time she thinks the system should have been activated and when it was actually activated, and does not know what effect an earlier activation would have had on the arrival of other VA Hospital staff. [Filing No. 52 at 24-25.] As a result, the United States

argues, Nurse Fischer's testimony on the VA Hospital staff's failure to activate the emergency response system is unreliable.  [Filing No. 52 at 25.]  Finally, it argues that Nurse Fischer did not opine on the emergency response system in her report.  [Filing No. 52 at 26-27.]

Ms. Cleveland does not specifically respond to the United States' arguments, but asserts generally that Nurse Fischer should be permitted to testify regarding matters not addressed in her report, but which were discussed at her deposition.  [Filing No. 58 at 36.]

The United States reiterates in its reply the arguments it made in its opening brief.  [Filing No. 59 at 7-8.]

As to the activation of the emergency response system, it is undisputed that Nurse Fischer did not discuss in her report whether VA Hospital staff should have activated the emergency response system sooner when Mr. Cleveland fell.  [See Filing No. 51-2 at 4.]  Her only reference to the emergency response system was to note: "It was not until after [VA Hospital staff's] attempts to upright Mr. Cleveland that the Emergency Alarm System was activated."  [Filing No. 51-2 at 4.]  Because Nurse Fischer did not opine in her report regarding whether VA Hospital staff timely activated the emergency response system and since Ms. Cleveland has not shown that this omission was substantially justified or harmless, Nurse Fischer cannot testify regarding that issue at trial. Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1).  And the fact that Nurse Fischer testified regarding activation of the emergency response system during her deposition does not cure this omission.  *See Ciomber*, 527 F.3d at 642 (party cannot cure deficient expert report by supplementing with later deposition testimony).

Further, Nurse Fischer provided vague testimony regarding the American Heart Association guideline she relies upon for her opinion that the emergency response system should

have been activated sooner, testifying that she did not know which version of the guideline was in effect when Mr. Cleveland fell:

> Q:  So the requirements of [the American Heart Associate] guidelines are that if you find an unconscious person, you hit the code button and you get help?
>
> A:  Correct.
>
> Q:  And that's the complete requirements of those guidelines?
>
> A:  Sometimes they'll say – you know, I have read different things over the years. And American Heart Association changes how they – the – how they have you do things.  They recently changed it.  I can't remember offhand what it is, but they changed it two or three years ago.  But you find somebody unconscious.  You find somebody in a bad situation.  You go, Help, I need help in here.  You push the button.  You get help in there.  And then you do rescue breathing.  You do – you do whatever you need to do.
>
> Q:  Do you know which version of the American heart Association guidelines were in effect –
>
> A:  No.
>
> Q:  -- at the time?
>
> A:  I don't know the date of that.
>
> ***
>
> Q:  The question is, you don't know which American Heart Association guidelines – you don't know the precise terms of the American Heart Association guidelines that were in effect with respect to an unconscious adult and the immediate need to activate the emergency response system at the time of care at issue in this lawsuit?
>
> A:  I don't know that there were any specific terms.  I just know it's unconscious adult.  You activate the emergency call system.
>
> Q:  And have you specifically reviewed the guidance that was in effect from the American Heart Association regarding an unconscious adult and the immediate need to activate the emergency response system at the time of the care at issue in this lawsuit?
>
> A:  No.  I mean, I don't know what was in effect at that time.

[Filing No. 51-4 at 21-23.]

Nurse Fischer was also unsure when questioned whether the American Heart Association guideline required VA Hospital staff to activate the emergency response system immediately upon finding Mr. Cleveland, and her deposition testimony reflected that she did not know how much time elapsed between VA Hospital staff discovering Mr. Cleveland and then triggering the emergency response system.  She testified as follows:

Q:  So my question is, does the standard invariably require that the first thing you do in every instance in encountering an unconscious adult is hit the emergency code button?

A:  I don't know that I can say in every.

Q:  Does it specify the circumstances under which you are required to hit the emergency code button first before proceeding to provide care –

A:  I don't –

Q:  -- to the patient?

A:  I don't know that it says that.

Q:  So what is the basis for your belief that the timing of the use of the – or activation of the emergency code response system in this case fell short of the American Heart Association guidelines?

A:  My belief is that the code button wasn't pushed until one of the nurses actually entered the room.  That's my understanding.

Q:  What is your understanding regarding the timing at which the emergency code button was activated?

A:  Again, there's very little documentation about that.  You can go on the anesthesiologist's report, which is his note, which is done minutes – well, quite a bit later.  All I had was the time of the fall was at 23:10.  And it seemed like there was some discrepancy as far as in the documentation of when the call – the emergency call system was activated because it seems like someone wrote that the – it was activated, like, 22:00.  22-something, which would have been before the time of the fall, like, 22:00 when he fell at 23:10.

Q:  So is it fair to say you simply don't know when the emergency code button was activated?

A:  That's correct.

Q:  Do you have an opinion regarding when the emergency code button was activated?

A:  I – I think it was activated after the nurses got into the room.

Q:  But that's based on speculation?

A:  Yes, my opinion.

Q:  And so it's your opinion that the emergency code button should have been activated before they entered the room?

A:  yes.

Q:  And who do you believe should have activated it?

A:  Tiffany [the technician].

Q:  Do you have an estimate of the delay between the time you believe the emergency code system should have been activated and the time you believe it was activated?

A:  No.  The documentation is not clear.

***

Q:  And because you don't know how much time elapsed between the time you believe the emergency code button should have been activated and the time that it actually was activated, you don't know what effect an earlier activation would have had on the arrival of other nursing staff; correct?

A:  Correct.

[Filing No. 51-4 at 25-28.]

It is apparent from Nurse Fischer's testimony that she was not sure whether applicable American Heart Association guidelines required the VA Hospital staff to immediately activate the emergency response system upon discovering Mr. Cleveland hyperextended on the commode, that she does not know when the emergency response system was activated, that she does not know how much time elapsed between when she thinks the emergency response system should have

been activated and when it actually was activated, and that her opinion that the emergency response system was not activated fast enough is based on pure speculation. Given that Nurse Fischer seeks to provide an opinion that VA Hospital staff did not follow applicable guidelines in activating the emergency response system, her lack of knowledge regarding the specifics of those guidelines and when the emergency response system was activated for Mr. Cleveland's hyperextension incident makes any such opinion unreliable and unhelpful to the factfinder. For that reason, and because Nurse Fischer did not provide an opinion regarding activation of the emergency response system in her report, Nurse Fischer is prohibited from providing that opinion.

2.   *Testimony Regarding How Mr. Cleveland Was Lowered to the Floor After the Hyperextension Incident*

The United States argues that Nurse Fischer "admitted that she had no objective basis for assessing the process by which [VA Hospital staff] lowered Mr. Cleveland to the floor," including testifying that there is no applicable standard of care or best practice for transferring a patient from a bedside commode to the floor. [Filing No. 52 at 25.] It asserts that any opinion regarding Mr. Cleveland's transfer to the floor "would be a matter of personal preference ungrounded in any objective standard or process of reasoning." [Filing No. 52 at 25.] It notes that Nurse Fischer's "only criticism of [the process of transferring Mr. Cleveland from the commode to the floor] is that the bedside commode was removed from beneath Mr. Cleveland at a greater speed than it should have been," but that Nurse Fischer does not know what that speed was and her opinion is based on speculation. [Filing No. 52 at 25-26.]

Ms. Cleveland does not specifically address the United States' arguments in her response brief, but argues generally that Nurse Fischer should be permitted to testify regarding topics not addressed in her report but covered in her deposition. [Filing No. 58.]

19

In its reply, the United States relies upon the same arguments it set forth in its initial brief. [Filing No. 59 at 7-8.]

Nurse Fischer did not opine in her report regarding whether VA Hospital staff failed to meet applicable standards of care when lowering Mr. Cleveland from the commode to the floor, [*see* Filing No. 5-2], and any opinion on that topic is precluded based on that omission.  Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1); *Ciomber*, 527 F.3d at 642.

Additionally, Nurse Fischer did not provide reliable testimony on that topic in her deposition.  Nurse Fischer testified as follows regarding the VA Hospital staff lowering Mr. Cleveland to the floor after they found him hyperextended on the commode:

> Q:  Do any of the nursing standards of care that you've cited in this case provide guidance on the manner in which three nursing staff should lower a man who weights over 395 pounds and is contorted on a bedside commode to the ground?
>
> A:  The standards don't speak to that.
>
> Q:  Are you aware of any best practice with respect to how three nursing staff should attempt to weigh a man who weighs – to move a man who weighs over 395 pounds from a bedside commode to the ground?
>
> A:  I'm not aware of that.

[Filing No. 51-4 at 42.]

> Q:  If the VA nursing staff had no alternative but to work together, the three of them, to remove Mr. Cleveland to the floor from the bedside commode, how do you think they should have done that?
>
> A:  I would be speculating at that point.
>
> Q:  Well, you've testified that you believe it was improper for them to do it in the manner that they did do it.
>
> A:  I do.
>
> Q:  So you have to tell me, you must have a way that you think was appropriate if you think the way that they did do it was inappropriate.  So what is that way?

A:  Well, had they activated the code button immediately –

Q:  That's not my question.  My question relates to if they had to remove him to the floor, you have testified that they did it in an improper fashion.  If the three of them working together had to remove him to the floor, you have testified they did it in an improper fashion.  So my question to you is, what is the right way to do that?  When you have three nursing staff working on their own to remove a 400-pound man to the floor, what is the right way to do that?

A:  I don't know that this is the right way, but if I have somebody hyperextend on a bariatric commode – and supposedly the commode is leaning back.  It's caught in the bed railing or whatever.  Rather than just pull the commode out and have him – his body fall to the floor, had they just inched it out a little at a time and had a smoother transfer instead of a traumatic blunt force injury, then maybe we wouldn't have had the situation we did.  It had to have been pretty blunt to cause his spleen to rupture.  So it's not like just lowering somebody to the floor they're not – their spleen is not going to be ruptured.

Q:  Do you know the precise speed at which Mr. Shaw removed the bedside commode from beneath Mr. Cleveland?

A:  No.

Q:  But yet you think he should have removed it at a different speed?

A:  I think from the record what I read is he grabbed it and pulled it out from underneath Mr. Cleveland…  That's not slow.

***

Q:  So why do you infer from his use of the term pulled that he didn't remove it in precisely the fashion that you would have recommended he do it?

A:  Due to the injury Mr. Cleveland sustained.

Q:  And so your belief that he pulled the bedside commode from Mr. Cleveland in an inappropriate fashion is based entirely on the fact that you believe Mr. Cleveland injured his spleen in the course of being lowered to the floor; is that correct?

A:  Falling to the floor, yes…..  I got that opinion in reading the records, the VA records.

Q:  Do you recall which doctor made that assessment?

A:  No.

Q:  Do you remember the date on which that assessment was made?

A:  No.  I believe it was on one of the radiology reports.

Q:  Are you qualified to determine independently whether the spleen was injured in the course of the hyperextension versus the assisted fall?

A:  No.

Q:  So you agree that with the exception of your displeasure with what you believe was the pace or rate at which Mr. Shaw pulled the bedside commode, everything else that the nursing staff did in terms of lowering him to the ground was appropriate; correct?

A:  From what I read.

[Filing No. 51-4 at 56-60.]

Nurse Fischer's testimony on this issue boils down to the fact that there was no standard of care applicable to lowering Mr. Cleveland to the floor after he was discovered hyperextended on the commode, but that Nurse Fischer believes that he was lowered too quickly based on the notation in the records that the commode was "pulled" out from underneath Mr. Cleveland and on the fact that his spleen ruptured, which would only occur with a hard fall, although Nurse Fischer cannot recall who determined that the fall caused Mr. Cleveland's spleen to rupture.  The Court finds that Nurse Fischer's testimony is based on speculation, given that she does not know important details related to lowering Mr. Cleveland to the ground, such as how quickly that occurred.  Her testimony is not grounded in medicine or applicable standards of care and is unreliable and not of aid to the factfinder.  Nurse Fischer is precluded from testifying regarding her opinion that VA Hospital staff improperly lowered Mr. Cleveland to the floor after discovering him hyperextended on the commode.

     *3.*     *Testimony Regarding Opinions Not Set Forth In Nurse Fischer's Report*

The United States also argues that the Court should preclude Nurse Fischer from testifying regarding any subjects that were not disclosed in her report, including testimony regarding any alleged deficiencies in the VA's record-keeping practices or the cause of Mr. Cleveland's hyperextension incident. [Filing No. 52 at 26-27.] It also notes that Nurse Fischer testified at her deposition that she is not qualified to provide an opinion regarding the cause of Mr. Cleveland's hyperextension incident. [Filing No. 52 at 27.]

Ms. Cleveland responds that Nurse Fischer should be able to testify regarding deficiencies in the VA Hospital's record-keeping practices, but does not elaborate on why this is so. [Filing No. 58 at 36.] She also states that Nurse Fischer should be able to testify regarding matters not in her report because those matters were covered in her deposition. [Filing No. 58 at 36.]

In its reply, the United States notes the lack of a substantive response from Ms. Cleveland regarding Nurse Fischer testifying on the VA Hospital's record-keeping practices and argues that the fact that topics not covered in Nurse Fischer's report were covered in her deposition does not mean that she should be allowed to testify on those topics. [Filing No. 59 at 8-9.]

At the outset, the Court finds that Nurse Fischer set forth the scope of her engagement in her deposition as follows:

Q:  Can you summarize for me what your opinions are in this case?

A:  My opinion is that the nursing staff, when they found Mr. Cleveland in a compromised state, they didn't activate the emergency call system immediately and then when – then they made the determination to get him to the floor in an improper transfer by pulling the commode out from underneath him.

Q:  And is that a complete summary of the opinions that you have in this case?

A:  I think that pretty much summarizes it.

[Filing No. 51-4 at 9.]

Further, it is undisputed that Nurse Fischer did not address either the VA Hospital's alleged deficiencies in record keeping or the cause of Mr. Cleveland's hyperextension incident in her report.   [*See* Filing No. 51-2; Filing No. 51-4 at 49-50 ("Q:   Okay.   And you didn't identify anywhere in your expert report insufficient documentation as one of the respects in which the care provided by VA medical staff fell short of the standard of care; correct?  A:  Correct.").]  Even if these topics were discussed at her deposition, Nurse Fischer's failure to address them in her report means that she is precluded from opining on those issues at trial.  *See Ciomber*, 527 F.3d at 642 ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.").

Additionally, Nurse Fischer testified that she did not have any expertise regarding determining the cause of Mr. Cleveland's hyperextension incident, which provides another basis for precluding testimony on that issue.  [*See* Filing No. 51-4 at 35 ("Q: Do you have any expertise that would enable you to determine which of these explanations [for the hyperextension incident] is most likely?  A:  I don't have expertise in that.").]

The Court **GRANTS** the United States' Motion to Preclude Expert testimony to the extent that Nurse Fischer is precluded from testifying regarding any failure by the VA Hospital staff to activate the emergency response system, the VA Hospital staff's lowering of Mr. Cleveland from the commode to the floor, or any matters that Nurse Fischer did not address in her report, including alleged deficiencies in the VA Hospital's record-keeping practices and the cause of Mr. Cleveland's hyperextension incident.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** the United States' Motion to Preclude Expert Testimony, [51].  Dr. Oppenheimer may not provide any opinions at trial regarding: (1) the

cause of Mr. Cleveland's death; (2) any imaging of Mr. Cleveland's spine; or (3) the cause of Mr. Cleveland's hyperextension incident.   Nurse Fischer may not provide any opinions at trial regarding: (1) whether VA Hospital staff met the standard of care in connection with activation of the emergency response system; (2) whether VA Hospital staff met the standard of care in connection with lowering Mr. Cleveland to the ground after the hyperextension incident; and (3) matters not discussed in Nurse Fischer's report, including alleged deficiencies in the VA Hospital's record-keeping practices or the cause of Mr. Cleveland's hyperextension incident.

Date: 8/24/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**